IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    )    No. 3:23-CR-119-KAC-JEM
    )
BRANDON RAY REECE,    )
    )
    Defendant.    )

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on Defendant Brandon Reece's Motion to Suppress [Doc. 76]. *See* 28 U.S.C. § 636(b). The Second Superseding Indictment charges Defendant Reece with two counts of possessing a firearm as a felon (Counts One & Two), two counts of conspiracy to purchase a firearm for a felon (Counts Three & Seven), and two counts of conspiracy to transport or dispose of a firearm to a felon (Counts Five & Eight) [Doc. 53 pp. 1–4]. These charges arise out of the stop of a vehicle driven by Defendant Reece on November 28, 2023 [Doc. 76]. Defendant moves to suppress all evidence flowing from the traffic stop and all evidence seized during the warrantless search of the vehicle, arguing that these actions violated his rights under the Fourth Amendment [*Id.*].

On November 28, 2023, Knoxville Police Department ("KPD") Officers Harvey and Seder stopped Defendant pursuant to traffic violations and on suspicion that he was involved in a "shots-fired" incident in the area. The officers ordered Defendant out of his vehicle at gunpoint, detained him in handcuffs, and searched his vehicle, seizing a 9mm Ruger firearm, two rounds of ammunition, and the casing from a spent round.

Defendant argues that Officers lacked probable cause or articulable reasonable suspicion to stop the vehicle. He also challenges the warrantless search of his vehicle after he was detained at the scene of the stop. Accordingly, Defendant contends that the fruits of the illegal seizure and subsequent search must be suppressed.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds that the officers had both probable cause to believe Defendant had committed traffic violations and reasonable suspicion to stop the vehicle in connection with the "shots-fired" report. The undersigned further finds that the officers properly conducted a protective search Defendant's vehicle, and would have inevitably discovered the firearm, bullets, and casing during an inventory search. The undersigned therefore recommends the District Judge **DENY** Defendant's suppression motion [Doc. 76].

## I.    SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned on March 25, 2025, for an evidentiary hearing on Defendant's Motion to Suppress [Doc. 90, Minutes]. Assistant United States Attorney Caroline Poore appeared on behalf of the Government. Attorneys Gregory Isaacs and Ashlee Mathis represented Defendant Reece, who was also present.

The Government presented the testimony of KPD Officer Emily Harvey, who testified that she has worked as a police officer since 2020 [Doc. 94 p. 6]. She stated she "currently work[s] for the community engagement response team" but "was working regular patrol" on November 28th, 2023 [*Id.* at 6–7]. On that date, she said she was riding along with Officer Seder, supervising, and assisting him, and evaluating his performance as part of his training [*Id.* at 7–8]. Officer Harvey said that while Officer Seder was driving, they responded to radio report by Officer McCurry, who said "he had heard gunshots in the area on Merchant[] Drive" [*Id.* at 8–9]. Officer Harvey stated

that when she and Officer Seder arrived near Merchant Drive, Officer McCurry "had made contact with some individuals outside of a bar, the Pint House, and . . . received a vehicle description and broadcast that on the radio" [*Id.* at 10].

The Government played a portion of Officer McCurry's dispatch [*Id.*; Exh. 7]. On the audio file, Officer McCurry says the vehicle description is a "dark-colored Dodge Ram" [Exh. 7 00:15–18].

Officer Harvey testified that upon hearing the vehicle description, she "went into our database called Flock . . . a license plate reader database and began looking through cameras that were in the area in order to attempt to locate a vehicle that might have been involved in the incident" [Doc. 94 p. 10]. She described the Flock system as a series of cameras located "mostly on state routes" that "scan license plates[ and] take photos of vehicles as they pass" [*Id.* at 11]. She confirmed she received training on how to operate Flock [*Id.* at 10]. Officer Harvey said the search function on the Flock website allows the user to search selected cameras within a certain time frame [*Id.* at 11]. She stated that she selected the time frame of 2:00 a.m. to 2:15 a.m. and scanned through the images until she located one that "matched the description" [*Id.*]. Officer Harvey said there "are three Flock cameras along Merchant[] drive" and affirmed that she looked at those cameras to determine whether a vehicle had left the area around that time [*Id.* at 11–12]. She stated in her search of images on the Flock cameras, she "observed a black Chevy Silverado that had a white Tennessee dealer's license plate" and that she believed "it hit the eastbound camera . . . on Merchant[] Drive" [*Id.* at 13]. Officer Harvey said "the time stamp on the Flock hit was the exact time that [she] heard Officer McCurry advise that there were shots in the area[ and] that the time stamp on the dispatch screen for that incident as well as the ending time stamp on the Flock were at the same time" [*Id.* at 14]. She affirmed that indicated to her that the vehicle was likely leaving

3

the area where the shots were fired at the time of the radio report [*Id.*] She stated she did not recall the numbers on the dealer tag, but "[t]he numbers . . . on the license plate were visible" and that she was able to view those [*Id.*]. After viewing this image captured by the eastbound camera, she said she and Officer Seder drove east on Merchant Drive to attempt to locate the vehicle [*Id.*]. She affirmed she did not recall observing a black or dark colored Dodge Ram in the fifteen minutes of Flock images she reviewed [*Id.* at 15]. Officer Harvey confirmed that there were no other vehicles, apart from the black Chevy Silverado, that came close to matching the provided description [*Id.*].

Officer Harvey said while driving east, she and Officer Seder passed a Chevy Silverado "head on," and they turned and followed the Silverado to determine if it was the vehicle in the Flock camera image [*Id.* at 15–16]. She confirmed that when the Silverado stopped at a traffic light, they caught up to it and were able to confirm the dealer tags matched the Flock camera footage [*Id.* at 16]. Officer Harvey estimated that she located the Silverado one-half mile from the location of the shots-fired incident [*Id.* at 16–17].

The Government played a video from Officer Harvey's in-car dash camera footage [*Id.* at 17; Exh. 2]. The beginning of the footage shows a black Chevy Silverado with white dealer tags driving in front of the police cruiser [*Id.*]. The truck travels through an intersection with a yellow light, but the officers stopped at that intersection when the light turned red [*Id.* at 7:16:05–11]. The truck stops momentarily at a red light at the next intersection but then proceeds when the light turns green [*Id.* 7:16:11–27]. The video then shows the officers activate the cruiser's emergency lights while they drive through the intersection with the red light, turning their lights off immediately after passing through the intersection [*Id.* at 7:16:28–29]. Officer Harvey testified that they activated their lights to drive through the intersection and then turned them off to catch up to the Silverado [Doc. 94 p. 18].

The footage further shows that when the officers caught up to the truck, the truck turned left and drove over a sidewalk into a parking lot [Exh. 2 7:16:30–55].

Officer Harvey confirmed that she observed a potential vehicle code violation when the vehicle turned left into the commercial parking lot [*Id.* at 19]. She stated that "[t]he vehicle did not enter into the driving entrance [but] entered over the sidewalk, which would be an unlawful use of the sidewalk" [*Id.* at 20]. Officer Harvey testified the truck drove over the curb and sidewalk into the parking lot, not through an entrance to the parking lot [*Id.*]. She identified the entrance to the parking lot on the paused video [*Id.*]. This image was captured and admitted as Exhibit 2-A [*Id.*]. Officer Harvey testified that they again activated the lights on their patrol car as they turned into the entrance of the parking lot to attempt to stop the truck [*Id.* at 21–22; Exh. 2 7:17:00].

The dash camera footage shows the truck driving over the sidewalk, not the parking lot entrance [Exh. 2 7:16:53–56]. Officers turned on the emergency lights and siren and followed the truck out of the parking lot [*Id.* at 7:17:07–13].

Officer Harvey testified that at 7:17:07 on the dash-camera video, she and Officer Seder "turned [their] lights on in order to attempt to stop the vehicle. However, [the vehicle] exited the business and continued down the road preparing to flee" [Doc. 94 pp. 21–22]. She stated that fleeing from a police car with activated lights and sirens is "a violation of Tennessee law for evading arrest" [*Id.* at 22]. Officer Harvey said that she believed the vehicle committed additional traffic violations as it fled, namely turning from the wrong lane, crossing over the center line, and speeding [*Id.* at 22]. She said the speed limit in that area is thirty-five (35) miles per hour and that she is trained to visually estimate a vehicle's speed [*Id.*].

The Government resumed play of the dash camera video, which shows that Officer Harvey and Officer Seder continued to follow the truck with their lights and sirens on, now heading the

5

opposite direction [Exh. 2 7:17:14–17]. The vehicle did not pull over but instead turned right from the inside lane, onto a residential street [*Id.* at 7:17:17–25]. The vehicle stopped at a stop sign, and the officers caught up to it and followed it closely from that point [*Id.* at 7:17:55]. The officers continued to follow directly behind the vehicle as it turned left into the parking lot of recreational fields [*Id.* at 7:17: 56–7:18:15]. The vehicle came to a stop, and the driver complied with Officer Seder's orders to show his hands by extending both hands out the driver's side window [Exh. 2 7:18:22–26].

Officer Harvey testified that at 7:18:00 on the recording, she observed that "[t]he vehicle had crossed over the double yellow center line" [Doc. 96 p. 23]. Officer Harvey affirmed that the driver shown in the video was Defendant Reece [Doc. 94 p. 24]. She stated that based upon the nature of the offense under investigation, which was the shots-fired report, and the driver's evading the stop, the officers conducted a "high-risk stop" or "felony stop" in which they order the subject to get out of the vehicle and come to them, rather than approaching the vehicle  [*Id.*]. Officer Harvey explained that Defendant presented an "unknown threat" because they believed he was involved in a shooting and could have a firearm and because he evaded the stop [*Id.*]. She said to assess an unknown threat the officers remove the occupant from the vehicle, rather than approaching a vehicle that may contain weapons, to take the occupant into custody safely [*Id.*].

Officer Harvey affirmed at the time Defendant stopped the vehicle, she reasonably believed that he may have committed the crime of "evading" [*Id.*]. Officer Harvey stated that she and Officer Seder also believed that the Silverado was the vehicle involved in the shots-fired report "based on the Flock camera hits and consistent description . . . relayed [by the officer] as well as [the truck's] failing to stop when [they] initiated [their] lights" [*Id.* at 25]. She said that the driver's failure to stop when officers activated their lights was "[i]ndicative of attempting to evade arrest

for the shooting incident" [*Id.*]. Officer Harvey affirmed that they ordered the occupants out of the vehicle for officer safety because the occupants could potentially be armed and dangerous [*Id.*].

Officer Harvey testified that during a felony stop, once officers remove the driver, they "attempt to call the passengers out of the vehicle" [*Id.*]. She said that in this case, the officers could not determine whether the vehicle contained other occupants due to the lighting and the tinted windows [*Id.*]. Officer Harvey explained that once the driver is in custody and if any passengers do not respond or do not get out, the officers approach the vehicle to confirm no threat exists [*Id.* at 25–26]. She agreed the officers do this because the vehicle could contain passengers who may be armed and dangerous [*Id.* at 26].

Officer Harvey confirmed that it is common practice to open the vehicle doors to ensure no one is inside [*Id.*]. She added that here, the officers needed to open the doors because the vehicle was a truck with high, tinted windows, unlike with a sedan where the officers could look into the vehicle with a flashlight [*Id.*]. Officer Harvey stated that here, they "would need to open the doors in order to verify there was nobody hiding in the floorboards" [*Id.*]. She explained the recreational baseball fields had "one light near the main office," but "no further lighting around the exterior of the field into the parking lot" [*Id.* at 26–27]. She agreed that the main lighting source was the headlights from the police cruiser [*Id.* at 27]. Officer Harvey confirmed that when an individual flees a traffic stop, the responding officers are concerned that the person may have committed a crime or may be armed and dangerous [*Id.*]. The Government resumed play of the dash camera video, which shows Officer Seder shouted commands to Defendant, who opened the driver's side door, got out of his truck, faced away from the officers with his hands raised, and walked backward toward the officers [Exh. 2 7:18:30–50].

Officer Harvey affirmed that the procedure depicted in the video was the standard felony traffic stop procedure [Doc. 94 p. 27]. She agreed that when Defendant got out of the truck, he left the driver's side door open [*Id.*]. Officer Harvey testified that she was wearing a body-worn camera that day as required for her position [*Id.* at 28]. She stated that she can manually start her body-worn camera, or it turns on automatically when the patrol car's emergency lights turn on or when the patrol car's doors open [*Id.*]. Officer Harvey stated that here, her body camera began recording when they activated their emergency lights while waiting at the red light [*Id.* at 28–29].

The Government introduced Officer Harvey's body-worn camera video [*Id.* at 29; Exh. 1]. On the video, the officers are following a vehicle in the patrol car, and Officer Harvey's laptop is partially open [*Id.* at 2:15:55–2:16:10]. Officer Harvey opens her laptop and enlarges a daytime Flock image of a black truck with Tennessee dealer tags [*Id.* at 2:16:10–15]. Officer Harvey testified that the image on her computer was a daytime photograph of the black Chevy Silverado she originally located on the Flock system [Doc. 94 p. 29]. She said she looked up a daytime image in order "to get an accurate representation of the vehicle" [*Id.*]. She agreed that the vehicle in the image on her laptop is the same vehicle that the officers stopped [*Id.*].

The video footage reveals that after looking at the enlarged image, Officer Harvey partially closed her laptop [Exh. 1 2:16:16–33]. As the video played, Officer Harvey testified that at 2:17:00, they had caught up to the vehicle, which made an unlawful turn into the parking lot, and they initiated the emergency lights to stop the vehicle [Doc. 94 p. 30; Exh. 1 2:16:33–2:17:05]. Officer Harvey testified that she and Officer Seder drove through the parking lot and pursued the vehicle to the baseball fields, where it stopped [Doc. 94 p. 30; Exh. 1 2:17:06–2:18:20]. The video recording shows that as the cruiser comes to a stop, Officer Seder jumps out of the driver's seat

[Exh. 1 2:18:21]. He then calls to the driver to show his hands, open the door, exit the vehicle, face away from him, and walk back toward the sound of his voice [*Id*. at 2:18:23–42].

Officer Harvey testified that after Officer Seder exited the patrol car, she planned to get out, too, but Officer Adam Ragon pulled up next to her, so she closed her door and allowed Officers Seder and Ragon to conduct the stop [Doc. 94 pp. 30–31].

Officer Harvey identified the video from Officer Seder's body-worn camera [*Id*. at 31; Exh. 3]. Officer Seder's body camera video shows the interior of the patrol car and Officer Harvey's laptop with the Chevy Silverado Flock image on the screen [Exh. 3 2:15:57–2:17:05]. Officer Seder activates his lights and siren [*Id.* at 2:17:07]. Officer Seder radios that they are following a black Silverado and "he's running" [*Id*. at 2:17:12–15]. As the patrol car continues the pursuit, Officer Seder radios that the driver of the Silverado is slowing down but not stopping [*Id*. at 2:18:05–07]. Officer Seder radios their location as entering the Inskip fields [*Id*. at 2:18:14–16]. Officer Seder stops the patrol car and quickly exits [*Id.* at 2:18:21–22]. Pointing his gun at the Silverado, he yells for the driver to show his hands, open the car door with his left hand, to get out of the vehicle and face away from him, to walk backward toward him, and then to drop to his knees and put his hands on his head [*Id.* at 2:18:24-59]. Another officer then handcuffed Defendant Reece and assisted him to his feet, all while Officer Seder continued to point his gun at Defendant [*Id.* at 2:19:00–25].

Officer Harvey affirmed that at this point, when the driver was outside the vehicle in handcuffs, the officers did not know whether other people were in the vehicle [Doc. 94 p. 32]. She stated that the standard procedure would be "to attempt to call any passengers or other occupants out of the vehicle and have them [walk backwards toward the officers] in the same fashion as the driver" [*Id.*]. Officer Harvey said if no passengers respond, the officers "would proceed toward the

9

vehicle and then ensure that there were no other occupants, no further threats in the vehicle" for officer safety [*Id.*].

The Government resumed play of Officer Seder's body-worn camera video [Exh. 3 2:19: 25–46]. Officer Seder's body-worn camera footage shows him calling out for passengers to show their hands [Exh. 3 2:19:42–46]. Officer Harvey testified that that standard protocol is for the officer to call for passengers even if officers do not know whether there were any passengers inside the vehicle because someone could be concealed inside the vehicle attempting to evade detection [Doc. 94 pp. 32–33].

The Government resumed playing Officer Seder's body camera video, which shows that when Officer Seder received no response from the vehicle following his call for passengers to make themselves known, Officer Seder approached the vehicle on the passenger side with his firearm drawn [Exh. 3 2:19:55–58]. He paused next to the passenger door, then opened the front passenger side door [*Id.* at 2:20:00–03]. Officer Seder states "Got a gun. Clear." [*Id.* at 2:20:04–05]. A gun is visible in the passenger floorboard [*Id.*]. Officer Harvey testified that when an officer approaches a vehicle in this manner, it is common for the officer to open the vehicle doors "[i]n order to ensure there are no further threats within the vehicle" [Doc. 94 p. 36].[1] Officer Harvey affirmed that opening the vehicle door is standard procedure for officer safety in a situation such as that observed on the video from Officer Seder's body-worn camera [*Id.* at 38–39].

The Government presented a nineteen-page document titled "Procedures for Impoundment and Towing of Motor Vehicles" [*Id.* at 39; Exh. 5]. Officer Harvey testified that KPD has a tow

---

[1]    In response to defense counsel's objection to Officer Harvey testifying about Officer Seder's reasons for taking certain actions, which was sustained by the undersigned, Government's counsel stated that Officer Seder no longer works for KPD, and the Government was not able to subpoena him for this hearing [Doc. 94 pp. 34–35].

policy that provides the procedures for towing and impounding vehicles, and she identified Exhibit 5 as the policy [Doc. 94 p. 39]. She said the officers towed Defendant's vehicle because it was involved in a violation of state law including evading law enforcement and Defendant declined to speak with officers; thus, the officers were "not able to make a call regarding the vehicle's status" [*Id.* at 39–40]. Officer Harvey stated she did not recall if she was the officer who called for the tow truck but that a tow truck arrived on the scene and the vehicle was towed [*Id.* at 40].

Officer Harvey testified that based upon her training and experience, she would tow the vehicle in this situation [*Id*. at 41]. She said pursuant to KPD policy, an arrested person who is the registered owner can decide whether their vehicle should remain at the scene or if they will have someone pick it up [*Id*. at 41–42]. She stated that Defendant, however, was not the registered owner of the vehicle and, thus, did not get to determine the status of the vehicle after the incident [*Id.* at 42].

The Government introduced a two-page document titled "Event Chronology" [*Id.*; Exh. 6]. Officer Harvey identified this document as the dispatcher's log of the traffic stop [Doc. 94 p. 42]. She clarified that the shots-fired dispatch is not included in this document because the dispatcher treated the traffic stop as a separate incident [*Id.* at 42–43]. Officer Harvey stated that the first date and time on the log, listed as "November 28, 2023, at 2:17:49," indicates the time when Officer Seder radioed that they were stopping the vehicle [*Id.*]. She said the dispatcher advised that the shots-fired call occurred at 2:05 a.m. [*Id.*].

On cross-examination, Officer Harvey testified she was not certain if she agreed with the statement that Flock cameras immediately picked up Mr. Reece's vehicle as it exited the Pint House parking lot [Doc. 94 p. 44]. She stated that there are multiple eastbound cameras in the vicinity of the Pint House, and she did not recall which of those cameras recorded the "Flock hit."

[*Id.*]. Officer Harvey could not say whether the Flock hit occurred immediately after [the truck] exited the Pint House parking lot [*Id.*]. Officer Harvey said the Flock camera close to the Pint House records eastbound traffic, but she did not know if it also records westbound traffic, which would be traveling toward the Pint House [*Id.*].

Officer Harvey testified that she was not aware of a Flock hit on this particular vehicle at 2:04 a.m., because the shots fired dispatch did not occur until 2:05 a.m. [*Id.* at 45]. Officer Harvey did not recall if Officer McCurry specified that he heard shots coming from the east [*Id.*] She also testified that she did not know Officer McCurry's path of travel to get to the Pint House, because she was not with him [*Id.*]. Officer Harvey said she and Officer Seder may have stopped at the Pint House while Officer McCurry was interviewing witnesses and that she and Officer Seder were "circulating the area" during this time [*Id.*]. She thought they were told that the shots had come from across the street [*Id.*]. Officer Harvey said she and Officer Seder were circulating and looking for shell casings or any evidence across the street [*Id.*]. She agreed their search was based upon information from the witnesses that was relayed to them [*Id.* at 46]. She did not recall whether she mentioned information from Officer McCurry in the narrative of her arrest warrant charging felon in possession [*Id.* at 47].

Defense counsel played footage from Officer McCurry's body-worn camera [*Id.*; Exh. 16]. The video shows Officer McCurry approach a black SUV pulling out of a parking lot [Exh. 16 2:11:04–8]. The passenger of the SUV rolls down the window, and Officer McCurry asks the women whether they heard gunshots [*Id.* at 2:11:08–10]. One of the two female occupants of the SUV replied, "No," and the other stated, "I did, and they came from over there" [*Id.* at 2:11:10–11]. The passenger then offered her ID, which Officer McMurry declined [*Id.* at 2:11:13–16]. Officer McMurry attempted to clarify the location from which the occupant heard the shots, and

12

one of the occupants then said she had heard the shots come from Chapman Highway, which Officer McCurry corrected to Clinton Highway, and she agreed [*Id.* at 2:11:18–23]. On the video, Officer Seder can briefly be seen standing next to Officer McCurry and the witness's car [*Id.* at 2:11:31]. One of the officers then asked the women if it was "a maroon Dodge or . . . a maroon pickup" [*Id.* at 2:11:33–35]. They replied that it was a black truck [*Id.* at 2:11:38–41]. They then clarified that it was a Dodge Ram and indicated the direction in which the truck went [*Id.* at 2:11:50–57]. Although the two women initially pointed in different directions, ultimately the passenger agreed with the driver and pointed in the direction indicated by the driver [*Id.* at 2:11:57–12:12:05].

Officer Harvey testified that while Officer Seder was present for the witness statements, she was not "standing next to him at that time" [Doc. 94 p. 47]. She did not recall whether Officer Seder told her what the witnesses said when he returned to the car [*Id.*]. Officer Harvey stated that she and Officer Seder discussed the vehicle descriptions given to Officer Seder, but that she did not recall what he told her at that time [*Id.* at 48]. Officer Harvey said she thought the dispatcher broadcast that it was a black Dodge Ram over the radio [*Id.* at 48–49]. She affirmed that on the video, Officer Seder thought it might have been a burgundy vehicle at that point in time [*Id.* at 49]. She confirmed that she was the training officer for Officer Seder [*Id.*].

Defense counsel presented Officer Harvey's arrest warrant for Defendant Reece, along with her accompanying affidavit [*Id.* at 51; Exh. 13]. The affidavit's narrative states that the two witnesses interviewed by officers on the scene wished to remain anonymous [Exh. 13 p. 2].

Officer Harvey identified the arrest warrant as the warrant she swore out [Doc. 94 p. 51]. She confirmed that she observed on the video from Officer McCurry's body camera, the witness try to hand the officer her license, which he declined [*Id.*]. She agreed that the statement in her

affidavit that the witnesses wished to remain anonymous was inconsistent with the video [*Id.* at 51–52]. Officer Harvey testified that she included the information she was given in her affidavit and that she was not aware of the conversation with the witnesses [*Id.* at 52]. Officer Harvey agreed it would have been standard procedure to take the name, number, and information of witnesses in a felony case [*Id.*]. She did not know if other officers got the license tag number of the witnesses' vehicle, and agreed that to her knowledge, no one went back the next day to determine if there was video footage of the parking lot [*Id.* at 53]. Officer Harvey stated that the basis for the arrest warrant was accurate but agreed that the information about the witnesses that she was given was not accurate [*Id.* at 53–54]. She stated she used information from other officers as part of the team conducting the investigation [*Id.* at 54]. Officer Harvey did not recall which officer gave her the inaccurate information [*Id.*].

Officer Harvey agreed that she did not mention a Flock camera in the narrative of the affidavit [*Id.* at 55]. She confirmed that she and Officer Seder began searching the area based on the witness observations communicated to dispatch and Officer Seder's conversation with the witnesses as opposed to the Flock information, and that "[t]he Flock was a secondary aspect of the investigation" [*Id.*].

Defense counsel additionally presented the affidavit of Officer Seder that accompanied an arrest warrant for Defendant for reckless endangerment with a deadly weapon [*Id.* at 56; Exh. 14]. Officer Harvey confirmed that the language from Officer Seder's narrative and the language from her own are the same [Doc. 94 p. 56]. She explained that she and Officer Seder were involved in the same investigation [*Id.*]. She did not recall why they each swore out a warrant in front of a separate magistrate judge but said that "the information [they] obtained during that investigation together is the same" [*Id.*]. Officer Harvey contended that using information from another officer

14

in a sworn affidavit is not inherently "bad" in a case where the affidavits are about the "same incident" because the officers work collectively to conduct investigations [*Id.* at 57].

Officer Harvey confirmed that she had received training on Flock cameras and testified that Flock cameras are designed to read license plates and determine the make and color of a vehicle but not the model or year of a vehicle [*Id.* at 59]. She stated she was not familiar with Flock's procedures "regarding preservation" of images or the ability for someone to store an image other than manually saving it [*Id.*]. Officer Harvey agreed that two witnesses observed a vehicle in the parking lot, but the identity of the witnesses that gave the vehicle description is unknown [*Id.*]. She confirmed that the images from the Flock cameras were not saved [*Id.* at 59–60]. Officer Harvey explained she was able to locate the daytime Flock image of the Chevy Silverado by searching for other images of that vehicle by license plate number [*Id.*].

Defense counsel presented a screen shot of the picture of the truck displayed on the laptop on Officer Harvey's body-worn camera [*Id.*; Exh. 18]. The image depicts Officer Harvey enlarging a daytime Flock image of a black Chevy Silverado with dealer tags [Exh. 18]. Officer Harvey agreed she could not say this image is of a vehicle driven by Defendant because the officers do not know who was operating the vehicle at the time that picture was taken [Doc. 94 p. 60].

Officer Harvey stated that the image of the Chevy Silverado leaving the Pint House exists because it was captured by the Flock camera, but the officers do not have that image [*Id.* at 61]. She testified that the daytime photo reflects "the same license plate, make, and model as the vehicle that the Flock camera captured," that night, but she did not have a video or photo of the image the Flock camera captured that night [*Id.*]. Officer Harvey said they had pulled the daytime image to "attempt to locate" the vehicle as they were circulating and that that vehicle was the same license plate, make, and model of the image of the vehicle the Flock camera captured that night [*Id.* at 61].

She confirmed the only photographic evidence of the vehicle is the daytime image from November 26th at 1:40 p.m. [*Id.* at 62]. Officer Harvey stated that she should have saved the Flock hit image of the vehicle from the night of the incident but did not do so [*Id.* at 63].

Defense counsel presented a Google Earth map encompassing parts of Clinton Highway, I-75, and Merchant Drive, including the Pint House and Austin's Steak & Homestyle Buffet [*Id.* at 64; Exh. 12]. Officer Harvey identified the Pint House and Wallace Memorial Church where Officer McCurry heard shots fired at 2:05 a.m. [Doc. 94 p. 64]. She identified I-75 on one side of the map and Clinton Highway on the other and agreed that the map depicts a high-traffic area [*Id.* at 64–65]. Officer Harvey also agreed one could possibly see several black or dark trucks in the area [*Id.* at 65].

Officer Harvey testified that the location at which she and Officer Seder first encountered the vehicle was "further east" than the area depicted by the map and therefore not on the map [*Id.*]. She stated that the vehicle passed them around where Merchant Drive turns into Cedar Lane [*Id.*]. Officer Harvey explained that when the vehicle passed them, she and Officer Seder made a U-turn to try to catch up to the vehicle to determine whether it was the same vehicle they were attempting to locate" [*Id.*]. She agreed that when they made the U-turn, they did not have information that that vehicle had engaged in any traffic violations but instead turned around based on what the witnesses said in the Pint House parking lot [*Id.* at 65–66]. She agreed that the witnesses identified a black Dodge Ram, and she and Officer Seder were following a Silverado [*Id.* at 66].

Officer Harvey explained that Officer Seder turned on the patrol car's blue lights prior to observing any driving infractions by the Silverado, "in order for [the patrol car] to proceed through the red light" [*Id.*]. She said Officer Seder turned the blue lights on again when Defendant Reece turned into the business's parking lot [*Id.* at 66]. She testified that when Defendant turned left into

16

the parking lot, he had not committed any traffic infractions other than driving over the sidewalk instead of through the entrance to the parking lot [*Id.*]. Officer Harvey affirmed that she believed he used his turn signal when he turned and was going below the speed limit [*Id.* at 66–67]. She stated that she had never arrested somebody for driving over a sidewalk [*Id*. at 67]. She said she and Officer Seder activated their blue lights because they "were investigating the shooting incident" and because the vehicle had driven over the sidewalk [*Id.*]. Officer Harvey confirmed that neither she nor Officer Seder charged Defendant with speeding, improper use of sidewalk, or evading arrest [*Id.*]. She agreed that when she and Officer Seder turned on their blue lights after Defendant Reece made the left turn, he was not free to leave [*Id.*].

Officer Harvey agreed that Defendant Reece exited the vehicle after it was stopped and complied with the officers' orders [*Id.* at 67–68]. She testified that she remained in the vehicle when Officer Seder exited but got out shortly thereafter to assist Officer McCurry who had handcuffed Defendant [*Id.* at 68]. Officer Harvey stated she did not approach Defendant's vehicle [*Id.*]. She did not recall whether the vehicle was off after Defendant Reece exited it [*Id.*]. Officer Harvey denied there was no longer a threat to officer safety when Defendant Reece was on his knees and handcuffed, because the officers did not know if others were in the vehicle [*Id.*]. Officer Harvey confirmed it was not her decision to open the passenger door or to search the vehicle [*Id.* at 69].

Officer Harvey agreed that the identities of the witnesses should have been recorded, that it is not best practice to make up allegations of which one has no personal knowledge in a warrant, and that it would have been reasonably prudent to have preserved the images from the Flock camera that evening [*Id.* at 69–70]. She confirmed that preserving those images would have revealed the location, color, time, make, and model of the vehicle [*Id.* at 70–71]. Officer Harvey

agreed that no evidence exists that the person driving the truck in the image from November 26th had anything to do with this case, but she also stated that the way in which she located "the image was not fabricated" [*Id.* at 71]. Officer Harvey confirmed that when she and Officer Seder made the U-turn on Merchant Drive, it was because of the witnesses' statements in the parking lot at the Pint House [*Id.*].

Officer Harvey testified that she did not recall why Officer Seder asked the witnesses whether they observed a maroon vehicle [*Id.*]. She stated that she initially looked through all the Flock images from a period of time, then, once she obtained the license number of the truck, she located a daytime image of it [*Id.* at 71–72]. Officer Harvey said she used her judgment to narrow down the images in her initial search as is typical when using an investigative tool [*Id.* at 72]. Officer Harvey stated that the Flock image of the truck was the one that matched the description of the vehicle in the area at that time, and she agreed that it was a "hunch" [*Id.*].

On redirect examination, Officer Harvey confirmed that she wrote what ended up being an inaccurate statement in her warrant narrative because she relied on information received through "collaborative investigation with other officers" [*Id.* at 73]. She confirmed that officers commonly rely on other officers' information when writing such affidavits in situations where multiple officers respond to a call [*Id.* at 73–74]. Officer Harvey explained that no one officer can "perform all of the duties needed on an investigative scene [and so] multiple officers perform multiple different functions on a scene in order for the investigation to continue" [*Id.* at 74]. She confirmed it was "standard practice" for officers to communicate this information to one another [*Id.*]. She further agreed that it was common practice to rely on information from other officers when writing an affidavit [*Id.*].

18

Officer Harvey stated she did not believe the similarity in language used in Officer Seder's affidavit and her affidavit was a problem because they "responded to the same incident," "are speaking about the same incident," and "collaborate[d] on the narrative together . . . [as] he was [her] trainee and [she] was his training officer [*Id.* at 74–75]. She said she believed that information to be accurate and true at the time she wrote it, and she was not attempting to mislead or mispresent the facts to the court [*Id.* at 75]. Officer Harvey explained that "[i]t would be inappropriate to use a narrative from this incident in a narrative relating to another shooting . . . at another time" [*Id.*]. She confirmed that officers responding to the same incident commonly collaborate on the narrative from their shared perspective [*Id.* at 75–76]. She did not recall why she did not mention Flock cameras in her affidavit [*Id.*]. But she affirmed that does not mean that the information in the affidavit was false [*Id.*].

Officer Harvey explained that the Flock database provides two methods for searching for vehicles, one of which is to "select which cameras you would like to search" [*Id.* at 77]. She stated that "you can input criteria such as make, color, and body style," but that you do not have to do so [*Id.*]. Office Harvey testified that in this case, she looked through each image over the relevant period of time [*Id.*]. She explained that Flock cameras take a photograph when they detect motion [*Id.*]. Officer Harvey said she located the black Chevy Silverado by looking through all the images by certain cameras [*Id.*]. With regard to the second search method, Officer Harvey said she took the tag number from the image of the Silverado and searched for other images of that vehicle by a Flock camera [*Id.*]. Officer Harvey noted that "you can't get to that point in searching without having a license plate number" [*Id.*].

Officer Harvey testified that the license plate number she used was from an image taken on the evening of the shooting at the time Officer McCurry notified dispatcher that he heard gun

shots [*Id.* at 77–78]. She also stated the black Chevy Silverado was the only vehicle photographed within ten to fifteen minutes of the dispatch that matched the description of a black Dodge Ram given by the witnesses [*Id.* at 77–78]. She stated that while the image was of a black Chevy Silverado, not a black Dodge Ram, the vehicles were similar because they are "both black full-sized pickup trucks" [*Id.* at 78]. Officer Harvey said "[a]t nighttime, in a heightened environment, witnesses may confuse make and model, but the general description is the same" [*Id.*]. She affirmed she did not see any black Dodge Rams in the Flock camera images for the fifteen-minute period leading up to or after the shooting, nor did she notice any other vehicles that would have matched the general description given by the witnesses [*Id.*].

Officer Harvey confirmed that even in this heavy traffic area, not many vehicles are on the road at 2:00 a.m., so the number of images that she searched through was not extensive [*Id.* at 79]. She confirmed that when she turned around to follow the vehicle, it was not only because of the witness's description of the vehicle, but also because of the Flock camera hit she had received [*Id.*]. Officer Harvey explained upon seeing a black Chevy Silverado, she and Officer Seder turned around "to attempt to stop the vehicle to . . . investigat[e] whether it was involved in the incident or not," because the vehicle with the dealer tag number matched an image from the Flock cameras taken shortly after the shooting [*Id.*].

On recross-examination, Officer Harvey acknowledged that her search of the Flock database did not "populate" with the specific vehicle for which the officers were looking [*Id.* at 80]. She said, instead, she had to "evaluate whether these vehicles in the area at the time matched the description or not" by looking through multiple vehicles and narrowing it down herself [*Id.*]. She did not recall how many vehicles she reviewed [*Id.*]. Officer Harvey confirmed that she got a Flock hit on a vehicle that was photographed at 2:04 a.m. going east, but when she

encountered Defendant Reece, he was traveling west [*Id.* at 81]. She estimated that she looked at more than ten but less than fifty vehicles from her Flock database search [*Id.*]. Officer Harvey testified that because the Flock system is not capable of searching by vehicle type, she had to look through each image to determine which vehicles may have matched the description from the witness statements [*Id.* at 81–82]. She stated that Flock "captures an image of that car at the time that it passes the camera" [*Id.* at 82]. She said the Flock camera takes "an image of the vehicle and then it also narrows that down to an image of the license plate" [*Id.* at 82]. According to Officer Harvey, here, one of the two eastbound camaras captured an image of the Silverado near in time to when Officer McCurry radioed about shots fired [*Id.*].

Officer Harvey explained that there are two ways to search the Flock database: an officer can search "all images that were captured by a specific camera" within "a certain timeframe," or an officer can search by license plate number, which "will provide each time the vehicle hit a Flock camera in the last [thirty] days" [*Id.* at 83]. She stated that the second method is how she "found the daytime image of the vehicle . . . in order to  . . . provide an accurate image [with] better lighting" [*Id.*]. Officer Harvey said she failed to save the image of the Silverado from her initial review of the vehicles, but she saw it [*Id.* at 84]. She agreed that officers would be more likely to get a better statement from the witnesses if they had recorded their identity [*Id.*].

The Government also presented the testimony of KPD Officer Adam Ragon, who testified that he has worked as a KPD officer for two and one-half years [*Id.* at 85]. He stated he was on duty as a patrolman responsible for "answering calls for service" at 2:05 a.m., on November 28, 2023 [*Id.*]. Officer Ragon testified that he was dispatched to Merchant Drive at that time for a "shots-fired call in the area" [*Id.* at 86]. He stated that he heard the shots while he was with Officer

Chris McCurry behind the Wallace Memorial Church, down the street from the Pint House [*Id.*]. He thought Officer McCurry sent the initial shots-fired dispatch [*Id.*].

Officer Ragon stated that after hearing about "seven or eight shots," he began searching the 700 and 800 blocks of Merchant Drive for "any signs of a shooting," like victims or property damage [*Id.* at 86–87]. He stated that he heard other officers had located "a potential suspect vehicle," so he drove to the location, where they were conducting a felony stop on the vehicle [*Id.*]. Officer Ragon said he caught up with the other officers as they were pursuing the vehicle and arrived as they stopped the vehicle at the Inskip Ballfields [*Id.* at 87–88]. Officer Ragon stated that at the time he arrived, Officers Seder and Harvey were on the scene, and Officer McCurry arrived after him [*Id.* at 88]. Officer Ragon stated that he assisted with the felony stop by helping "clear[] the vehicle" after Defendant was in custody [*Id.*]. He explained that after "people are taken into custody, [officers] will walk up to the vehicle and ensure that there's nobody hiding inside the vehicle that [they] cannot see" [*Id.* at 88–89]. Officer Ragon agreed this is a common procedure in a fleeing vehicle situation to protect officers because there is "generally a reason" the driver is fleeing, which creates an unknown risk [*Id.* at 89].

Officer Ragon confirmed that once the driver was out of the vehicle, he and Officer Seder approached the vehicle [*Id.*]. Officer Ragon stated that the surroundings were "very dark," so he could not see into the vehicle clearly [*Id.*]. He thought that the vehicle had tinted windows and stated that while the road had streetlights, the ballfield lacked any lighting [*Id.* at 90]. He said the only lighting was from the headlights on the patrol vehicles [*Id.*]. Officer Ragon confirmed that a pickup truck is generally taller than the normal sedan, which makes it more difficult to see whether other people are hiding inside [*Id.*].

Officer Ragon testified that he provided back up to Officer Seder as he approached the stopped pickup truck for officer safety [*Id.* at 90–91]. He explained that he and Officer Seder approached from different locations to ensure that neither was hurt [*Id.* at 91]. He said after Officer Seder opened the passenger door, he went to the driver's side of the vehicle [*Id.* at 90–91]. Officer Ragon stated that he did not open the driver's side door of the truck because it was already open [*Id.* at 91]. Officer Ragon said he was able to see the inside of the vehicle through the open door and that he saw two unspent shells or bullets in the seat [*Id.*]. Officer Ragon confirmed the bullets were plainly visible on the driver's seat [*Id.* at 92].

Officer Ragon stated that he also saw a firearm in the passenger-side floorboard and could tell that the slide was locked to the rear [*Id.*]. He confirmed he was standing outside of the vehicle next to the open driver's side door and did not have to move anything or touch anything within the vehicle to observe the firearm [*Id.*]. Officer Ragon explained that after observing the two rounds of live ammunition and the firearm, he looked in the back of the vehicle for more firearms or related items [*Id.* at 93]. He testified he looked for additional firearms to ensure the safety of everyone on the scene because someone could enter the vehicle and use the firearms against officers and others on the scene [*Id.*]. He confirmed that "it's important for [his] safety and the safety of others around to ensure that all the firearms are located in the vehicle" [*Id.*].

The Government presented footage from Officer Ragon's body-worn camera [*Id.* at 93–94; Exh. 4]. The footage shows Officer Ragon exiting his police car and pointing his gun toward the stopped vehicle [Exh. 4 2:18:23-28]. Another officer orders the driver to place his hands outside the window, open the door, exit the vehicle, face away from him, and walk backwards, and the driver complied [*Id.* at 2:18:24-40]. The video shows Officer Ragon standing between two

police cars with his gun pointed in the direction of the vehicle as the defendant walked backwards to the other officers and while Defendant was taken into custody [*Id.* at 2:18:40–19:04].

Officer Ragon testified that while Officer Seder is giving commands to the driver, he was watching the truck to confirm that no threats came from the vehicle while they took Defendant into custody [Doc. 94 p. 94]. Officer Ragon said from his location between the police cars, he could not determine whether there were other individuals inside the truck [*Id.*].

The Government resumed play of the body camera footage [*Id.*; Exh. 4]. Officer Ragon called out asking if anyone else was in the truck [Exh. 4 2:19:32–33]. Shortly thereafter, another officer called out for passengers to show their hands [*Id.* at 2:19:39–44].

Officer Ragon testified that when he asked if anyone else was in the truck, he was speaking to Officer Seder [Doc. 94 p. 94]. He testified that if Officer Seder answered, he did not hear his answer as to whether the vehicle contained passengers [*Id.* at 94–95]. Officer Ragon confirmed that officers will commonly call out for passengers to show their hands like Officer Seder did because if there are passengers, "most people will go okay, they see me and they'll put their hands up" [*Id.* at 95]. He said if officers do not get a response to that command, the standard procedure is to look inside the vehicle to confirm no one is inside to make sure the scene is safe [*Id.*].

Officer Ragon's body camera footage shows Officer Seder approaching the vehicle on the passenger side [Exh. 4 2:19:54-57]. Officer Ragon explained that at this point, he was providing back up for Officer Seder in case someone was in the vehicle [Doc. 94 pp. 95–96].

The Government played another short segment of Officer Ragon's body camera video [*Id.*; Exh 4 2:19:57–2:20:03]. This segment shows Officer Seder briefly looking into the rear and front passenger windows, then opening the front passenger door [Exh. 4 2:19:58-2:20:01]. Officer Ragon confirmed that in his training and experience, an officer in this situation would open the

24

passenger door to ensure there are no passengers inside the vehicle [Doc. 94 p. 96]. He also explained that he would not rely only on peering into the windows because the windows were tinted and would not provide a clear view of the interior [*Id.* at 96–97]. Officer Ragon stated that he went to the driver's side of the vehicle after Officer Seder said it was all clear [*Id.* at 97].

The video shows Officer Ragon walking to the open driver's side door [Exh. 4 2:20:04–10]. Officer Seder points to the gun in the passenger floorboard and says "gun on the floor" [*Id.* at 2:20:10–11]. Officer Ragon then says that there are bullets on the driver's seat [*Id.* at 2:20:12–13].

Officer Ragon confirmed that he could clearly see the firearm from his location without having to reach inside the vehicle or move anything when Officer Seder mentioned the firearm on the floorboard [Doc. 94 p. 97]. He also stated that he could clearly view the ammunition in the driver's seat from where he was standing outside the vehicle [*Id.* at 97–98]. Officer Ragon said going to the driver's side of the vehicle is common practice in this type of situation where Officer Seder had already gone to the passenger side "to make sure that the other side was cleared and to assist with whatever he needs" [*Id.* at 98].

Officer Radon's body camera video shows that Officer Ragon opened the center console while Officer Seder shined his flashlight into it before Officer Ragon closed it [Exh. 4 2:20:28–30]. Officer Seder then quickly opened and closed the vehicle's glovebox [*Id.* at 2:20:33–35]. The video also shows Officer Ragon shining his flashlight underneath the driver's seat [*Id.* at 2:20:39]. He then opened the rear driver's side door and inspected the backseat of the truck [*Id.* at 2:20:45–50].

Officer Ragon testified he opened the center console and peered under the driver's seat looking for firearms, but he did not find any at that time [Doc. 94 p. 98]. He said he opened the

rear driver's side door "to make sure there were no other guns in the passenger seat," but did not find any [*Id.*]. Officer Ragon stated that he found a spent shell casing "[b]ehind the driver's seat . . . in the floorboard" after moving some of the clothing or blankets that were on the floor [*Id.* at 99].

Officer Ragon said that after he saw the gun, the ammunition, and the shell casing, he told Officer Seder about these items [*Id.*]. Thereafter, other officers took Defendant into custody [*Id.*]. After that, Officer Ragon stated that KPD towed the vehicle and the officers logged the gun and other evidence, but he did not recall whether he was the officer who called the tow truck [*Id.* at 99–100].

On cross-examination, defense counsel presented a map encompassing parts of Clinton Highway, I-75, and Merchant Drive including the Wallace Memorial Baptist Church, the Pint House, and Austin's Steak & Homestyle Buffet [*Id.* at 100; Exh. 11].

Officer Ragon testified that he was parked at Wallace Memorial Baptist Church, which is a thirty-second walk from the Pint House [Doc. 94 pp. 100–101]. He stated that he heard "the sound of several gun shots" at approximately 2:05 a.m. on November 28th [*Id.* at 101]. Officer Ragon said he believed Officer McCurry was the officer who called the shots into dispatch [*Id.*]. He said he and Officer McCurry did not know from where the shots came, and he did not recall talking about the shots coming from the east with Officer McCurry [*Id.*]. Officer Ragon stated that after they alerted the dispatcher to the shots, he then drove around the area searching for victims or any signs of the gunshots [*Id.*]. Officer Ragon said he did not "believe [he] interviewed anybody" about the gunshots [*Id.* at 102].

Officer Ragon identified I-75 and Clinton Highway on defense counsel's map but stated that Clinton Highway does not have a high volume of traffic at 2:00 a.m. [*Id.*]. He questioned

whether most restaurants were still open at that time and said probably only Casey's and the Pint House were open [*Id.*].

Officer Ragon testified that he arrived at the Inskip Ballfield before Officer McCurry [*Id.* at 103]. He said he did not know if Defendant was out of his truck or getting out at the time he arrived [*Id.*]. He agreed that Defendant was compliant and was handcuffed and on the ground after exiting the vehicle, but Officer Ragon did not "recall if the vehicle was running or turned off" [*Id.*]. Officer Ragon also agreed that at that point, after he was taken into custody, Defendant did not present a danger to officers [*Id.*]. Officer Ragon did not know whether Officer Seder shined his flashlight into the vehicle before opening the door [*Id.* at 103–04]. Officer Ragon said that the officers did not discuss obtaining a search warrant for the truck [*Id.* at 104].

Officer Ragon confirmed that Officer Seder approached the vehicle and opened the passenger side door without discussing these actions with anyone [*Id.* at 104]. He agreed that when Officer Seder saw him, Officer Seder pointed out the gun on the floorboard [*Id.*]. Officer Ragon did not recall whether he first saw the gun before or after Officer Seder pointed it out [*Id.*]. He agreed that he searched the back of the vehicle, the backseat floorboard, and opened the console without a warrant [*Id.* at 104–05].

Officer Ragon testified that "[a]fter [he] cleared the vehicle and found nobody in there . . . [he] no longer felt a danger" [*Id.* at 105]. He said that he found "a spent cartridge in the back seat" of the vehicle but did not find any in the Pint House or Austin's parking lot [*Id.* at 105–06].

On redirect examination, Officer Ragon confirmed that observing the live ammunition in the driver's seat and the firearm led him to believe that the individual they stopped may have been involved in the shooting they were investigating [*Id.* at 107]. He also thought the truck could contain more evidence of the shots fired incident [*Id*]. Officer Ragon also confirmed that officers

27

commonly conduct an inventory search of a vehicle when they tow it, which involves "documenting items that are in the vehicle" [*Id.* at 107–08]. He agreed the inventory would include the gun and the ammunition in plain view and the items on the backseat [*Id.* at 108].

Officer Ragon agreed that in some situations, individuals in custody flee and gain access to firearms located in vehicle [*Id.*]. He affirmed that it is important to secure all firearms because somebody could break away from custody [*Id.*].

On recross-examination, Officer Ragon testified that he and Officer McCurry were behind the Wallace Memorial Church at 2:04 a.m. because that is where they draft reports, eat lunch, and do other similar tasks [*Id.* at 109]. He stated that he was not surprised to hear that Casey's, McDonald's, and the Shell gas station are open twenty-four hours and Taco Bell is open until 3:00 a.m., all within a few feet of the church [*Id.*].

At the conclusion of the evidence, the undersigned granted defense counsel's request to file post-hearing briefs after obtaining the transcript in lieu of argument [*Id.* at 110–12]. Defendant filed a post-hearing brief on April 29, 2025 [Doc. 98]. The Government filed a responding brief on May 13, 2025 [Doc. 99], and Defendant filed a reply brief on May 20, 2025 [Doc. 100]. Thereafter, the undersigned took the matter under advisement.

## II.    FINDINGS OF FACT

Shortly after 2:00 a.m., on November 28, 2023, KPD Officers Chris McCurry and Adam Ragon were on duty and parked at the Wallace Memorial Baptist Church on Merchant Drive, when they heard seven to eight gunshots. At 2:05 a.m., Officer McCurry radioed to the dispatcher that he heard what he believed were gunshots. Officers McCurry and Ragon began to patrol the area looking for the source of the shots. Officer Emily Harvey and trainee Officer Joshua Seder heard Officer McCurry's radio report and traveled to the Pint House bar, which is on Merchant Drive, a

short distance from the church. Officer McCurry and Officer Seder spoke with two women in a Black SUV in the Pint House parking lot. The women indicated that they heard the gunshots, which came from the direction of Clinton Highway. One of the women stated that after hearing the shots, she saw a black Dodge Ram truck traveling eastbound on Merchant Drive, but the other woman first said the vehicle went westbound before agreeing with the other woman that it went east. At 2:10 a.m., Officer McCurry radioed the vehicle description of a black Dodge Ram to the investigating officers.

After learning of the description of the vehicle and its direction of travel, Officer Harvey searched the Flock license plate reader database for photographs of all vehicles that had passed the three cameras on Merchant Drive closest to the Pint House within ten to fifteen minutes of 2:05 a.m. She reviewed the photos of ten to fifty vehicles retrieved in the search and located a photograph of a black Chevrolet Silverado with white dealer tags, which was taken by one of the Flock cameras at 2:04 a.m. According to Officer Harvey, the black Silverado was the only black or dark-colored truck in the group of images she reviewed. Officer Harvey searched the Flock database using the license plate number of the Silverado and located a daytime photograph of the Silverado taken two days earlier. Officers Seder and Harvey began driving eastbound on Merchant Drive looking for the truck.

Around 2:16 a.m., Officers Seder and Harvey passed a black Chevrolet Silverado, which was traveling westbound on Merchant Drive. Officer Seder turned and began following the truck. The patrol car stopped at a traffic light while the truck continued west on Merchant Drive through another traffic light and nearly out of sight. Officer Seder briefly activated his patrol car's emergency lights to travel through the intersection, then deactivated them and accelerated to catch up to the truck. As Officer Seder drew close to the truck, the driver turned left and drove over a

29

sidewalk and a grassy verge into a commercial parking lot. Officer Seder activated his lights and siren and pursued the truck through the parking lot and back onto Merchant Drive. While trying to catch up to the truck, the officers saw the driver turn right from the inside lane onto a residential street. Officer Seder continued to follow the truck, with his lights and siren activated. Officer Seder followed the truck for seventy-five seconds before it stopped at the Inskip Ballfields. Officer Ragon and Officer McCurry also arrived at the scene of the stop shortly after Officers Seder and Harvey.

Officer Seder quickly exited his patrol car and ordered the driver of the truck out of his vehicle at gunpoint. Defendant complied with Officer Seder's orders, placing his hands out of the driver's side window, getting out of the vehicle, and walking backward to Officer Seder, where he was handcuffed and detained by Officer McCurry. Officer Ragon, who was standing with his firearm pointed at the truck, asked if it contained passengers. Officer Seder ordered any passengers to exit the vehicle. When no one exited, Officer Seder approached the passenger side of the truck with his gun drawn, looked in the rear and passenger windows, which were tinted, then opened the passenger door and saw a gun on the passenger-side floorboard. Meanwhile, Officer Ragon approached the open driver's side door of the truck, saw the gun on the passenger floorboard, and observed two bullets on the driver's seat. Officers Seder and Ragon then searched in the console, the glovebox, under the seats, and in the backseat for additional firearms or ammunition. Officer Ragon found a shell casing on the backseat floorboard under some clothing and blankets.

III.     ANALYSIS

The Fourth Amendment protects citizens from unreasonable searches or seizures. U.S. Const. amend IV. Defendant argues the stop of the vehicle violated the Fourth Amendment because the officers lacked probable cause that he had committed a traffic violation or reasonable

30

suspicion that he was involved in the shooting [Doc. 76 pp. 5–6; Doc. 98 pp. 9–13]. Defendant also contends the warrantless search of his vehicle violated the Fourth Amendment and no exception to the warrant requirement applies [Doc. 76 p. 8; Doc. 98 pp. 14–17]. He asks the Court to suppress the evidence seized from the vehicle as the fruit of the unconstitutional seizure and search [Doc. 76 pp. 10–11; Doc. 98 p. 17].

For the reasons set forth below, the undersigned finds the officers properly stopped Defendant's vehicle, because the officers had both probable cause that he had committed a traffic violation and reasonable suspicion that the vehicle was involved in the commission of a crime. Additionally, the undersigned finds that the officers properly conducted a protective search of Defendant's vehicle for weapons and would have inevitably discovered the gun, bullets, and casing inside the truck while inventorying its contents pursuant to the KPD's tow policy.

## A.     Stop of the Vehicle

Defendant argues that law enforcement lacked probable cause to believe a traffic violation had occurred or reasonable suspicion to initiate a stop of the vehicle [Doc. 76 p. 3]. As explained below, the undersigned finds that when officers stopped Defendant's vehicle in the parking lot of the ballfields, they had both probable cause to stop Defendant's truck for a traffic violation and reasonable suspicion to believe that Defendant's vehicle was involved in the commission of a crime.

### 1.     Timing of Seizure

The undersigned first examines when the stop occurred. "For purposes of the Fourth Amendment, an encounter between an officer and a citizen becomes a seizure when the officer restrains the person's freedom of movement 'by means of physical force or a show of authority.'" *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021) (quoting *United States v.*

31

*Mendenhall*, 446 U.S. 544, 553 (1980)). In other words, "a person is seized when a reasonable person would not believe he or she was free to leave or disregard the officer's requests." *Id.* (citing *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004)). Additionally, for a seizure to occur, "the person must actually surrender to the officer's show of authority." *Id.* (citing *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010)).

Defendant argues that he was seized when the officers activated their lights and siren while pursuing his truck [Doc. 76 p. 5; Doc. 98 pp. 13–14]. He asserts that the officers "activated their blue lights at several points while trying to catch up to the [truck]" [Doc. 98 p. 14; Doc. 100 p. 7]. He contends that the officers first turned on the patrol car's emergency lights to proceed through a red light when they were behind his truck [Doc. 98 p. 14; Doc. 100 p. 7]. Defendant maintains that the officers again turned on their emergency lights before his purported illegal left turn over a sidewalk and into a parking lot [Doc. 98 p. 14; Doc. 100 p. 7]. The undersigned finds the dash camera from Officer Seder's patrol car shows differently.

Officer Harvey testified that Officer Seder activated the lights on the patrol car briefly to travel through an intersection with a red light and turned on the patrol car's lights and siren after Defendant made an illegal turn over the sidewalk and into the parking lot of a business [Doc. 94 pp. 18, 21–22, 28, 30, 66–67]. The dash camera video corroborates this account. The video shows that Officer Seder briefly activated his lights to proceed through an intersection during a red light, and at this time, Defendant was well ahead of the patrol car, through another intersection with a traffic light, and almost out of sight [Exh, 2 7:16:26–30 (dash camera); *see also* Exh. 3 2:16:26–30 (Seder body-worn camera); Exh. 1 2:16:26–29 (Harvey body-worn camera)]. Officer Seder did not activate the patrol car's siren while traveling through the intersection [Exh. 2 7:16:26–30]. After proceeding through the intersection, Officer Seder turned the emergency lights off and

accelerated to catch up with the truck [*Id.* at 7:16:30–7:16:49]. The patrol car drew near the truck as it turned left across the sidewalk into the parking lot [*Id.* at 7:16:50–56]. Officer Seder did not activate the patrol car's lights again along with the siren until after Defendant had turned into the commercial parking lot and after the patrol car had driven past Defendant to the entrance of the parking lot and entered [*Id.* at 7:17:07].

But even if Officer Seder's initial activation of lights and sirens while stopped at the red light was a show of authority to stop the truck, Defendant did not stop. "Stopping after being ordered to stop triggers the Fourth Amendment." *Johnson*, 620 F.3d at 691 (citing *United States v. Jones*, 562 F.3d 768, 775 (6th Cir.2009) (holding that defendant was seized when he "complied with [the officer's] order to stop")). In contrast, "[a] motorist who continues driving after a police officer has activated his sirens has not been 'seized' under the Fourth Amendment." *United States v. Zabawa*, 134 F. App'x 60, 63 (6th Cir. 2005) (finding that it was proper to consider a defendant's "second swerve" "in determining whether [the officer] had reasonable suspicion that [the defendant] was intoxicated" because it "occurred before he submitted to the officer's authority"). Here, Defendant did not stop in response to Officer Seder's lights and siren after he had turned into the commercial parking lot. Instead, Defendant exited the parking lot and sped away [Exh. 2 2:17:07]. Defendant did not submit to the officer's lights and siren for over one minute when he stopped in the parking lot of the ballfields [*Id.* 2:17:07–2:18:22]. At that point, Defendant was seized.

Defendant relies on case law stating that a stop can begin when an officer activates the patrol car's blue lights. *See United States v. Bias*, No. 3:08-cr-52, 2008 WL 4683217, at *8 (E.D. Tenn. Oct. 29, 2008) (finding that the officer's "stop and seizure of [the d]efendant began when he activated his vehicle's lights" (citations omitted)). He contends that the lights and siren

were a clear show of authority by officers' intent on detaining him, and he was no longer free to leave [Doc. 98 p. 13; Doc. 100 p. 7]. But, the occupants of a vehicle are seized for purposes of the Fourth Amendment "from the moment [a car stopped by the police comes] to a halt on the side of the road." *United States v. Elmore*, 692 F. Supp. 2d 915, 931 (E.D. Tenn. 2010) (alteration in original) (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Even considering the officers began the stop when they activated their lights and sirens after turning into the commercial parking lot, Defendant was not seized for an additional seventy-five seconds until his vehicle halted in the parking lot of the ballfields.

### 2. Probable Cause

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993); *see also United States v. Stevenson*, 43 F.4th 641, 644–45 (6th Cir. 2022) (observing that an officer may stop a vehicle based on reasonable suspicion of a completed felony, reasonable suspicion of a misdemeanor in progress, or probable cause of a completed civil traffic infraction). To determine whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment, the Court objectively evaluates the officer's conduct considering the surrounding circumstances known to the officer. *Ferguson*, 8 F.3d at 388. The officer's subjective basis for conducting a traffic stop does not matter so long as the officer had probable cause to believe a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 813 (1996).

"Probable cause 'is not a high bar.'" *Stevenson*, 43 F.4th at 645 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). Instead, probable cause amounts to "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United*

*States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 385 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

Officer Harvey testified that as she and Officer Seder were following Defendant's truck, they witnessed Defendant drive over the sidewalk in violation of Tennessee Code Annotated § 7-31-106 (improper use of a sidewalk). Defendant argues that the officers stopped Defendant before any purported traffic violation occurred and as part of their investigation of a shots-fired report, not because of a traffic violation [Doc. 98 pp. 12–13; Doc. 100 p. 8]. He also contends that Defendant's crossing of the sidewalk was not an improper use of a sidewalk [Doc. 100 pp. 8–9].

As discussed in section A.1. above, Officer Harvey testified and the dash camera video shows that the officers did not activate their emergency lights and siren to stop Defendant until after Defendant turned across the sidewalk into the commercial parking lot. Defendant asserts that Officer Harvey's testimony demonstrates that the officers stopped him as part of their investigation of the shots-fired report, which is corroborated by the absence of any traffic citations. But when analyzing whether an officer has probable cause for a traffic stop, the Court does not consider the subjective beliefs or intentions of the officer. *Whren*, 517 U.S. at 813 (observing an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); *see also United States v. Miller*, 413 F. App'x 841, 843 (6th Cir. 2011) ("[E]ven if [the officer] used the failure to signal as a pretext to initiate a traffic stop of an otherwise-suspicious vehicle, this fact does not undermine the probable cause that existed to make the stop if [the defendant] failed to signal his turn."). Thus, if Officer Harvey observed a violation of law, the stop is constitutionally valid without regard to her underlying motivations for the stop.

35

Defendant argues that Defendant's crossing the sidewalk to enter the parking lot was not an "improper use" of the sidewalk and, thus, does not amount to a traffic violation. Under Tennessee law, it is a Class C misdemeanor to "ride[] or drive[] a horse, team or other vehicle on the sidewalks, except for the purpose of crossing the sidewalks when necessary to do so[.]" Tenn. Code Ann. § 7-31-106. Defendant argues that the statute permits crossing a sidewalk with a vehicle when "necessary" and that the proof presented at the evidentiary hearing does not clearly show the location of the sidewalk in relation to the "paved curb areas [or] where the entrances to the business were located" [Doc. 100 pp. 8–9].

Officer Harvey testified that when Defendant turned left, "the vehicle did not enter into the driving entrance, driveway toward the commercial business [but, instead, i]t entered over the sidewalk which would be an unlawful use of the sidewalk" [Doc. 94 p. 20]. She agreed that the point where Defendant's truck drove over the curb and into the parking lot was not an entrance to the parking lot [*Id*.]. Officer Harvey circled the entrance to the parking lot on the paused dash camera video, and the Government entered a screenshot of her mark as an exhibit [*Id*.; Exh. 2A]. The area that she circled is the point at which the patrol car entered the parking lot [Exh. 2A]. The screen shot reveals that a raised curb separates the sidewalk from the road at the point where Defendant crossed, but there is no curb, and the entrance is flush with the road where the patrol car entered. The dash camera video corroborates Officer Harvey's testimony. The video shows the patrol car enter the parking lot at one entrance and the truck and the patrol car both exit the parking lot from a second entrance [Exh. 2 2:16:56–2:17:11]. Moreover, the video shows that the truck drives over not only the curb and the sidewalk but also a narrow grassy area before entering the parking lot [*Id*. at 2:16:53–57]. Defendant's entrance into the parking lot over the curb, sidewalk, and grassy verge was not necessary because the parking lot had two entrances from Merchant

36

Drive, and at least one appears clearly unobstructed on the video at the time Defendant turned into the parking lot.

Here, the officers witnessed the vehicle commit a traffic violation by driving over the sidewalk. This gave the officers the necessary probable cause to conduct a traffic stop. While Defendant minimizes the import of the sidewalk infraction, "even a minor traffic violation provides probable cause for a traffic stop." *United States v. Parker*, 17 F. Supp. 3d 667, 670 (W.D. Ky. 2014) (citations omitted). And after the officers initiated their lights and siren, the proof at the evidentiary hearing shows the officers witnessed Defendant attempt to evade arrest (Tenn. Code. Ann. § 39-16-603), make an improper wide right turn (Tenn. Code. Ann. § 55-8-140), swerve across the double yellow line (Tenn. Code. § 55-8-121), and exceed the speed limit (Tenn. Code Ann. § 55-8-152). Therefore, the officers properly stopped Defendant based upon probable cause that he had committed several traffic violations.

### 3. Reasonable Suspicion

Law enforcement may temporarily seize a person or vehicle, and thus, conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1978); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) ("It is well settled that the *Terry* doctrine applies to investigative stops of a moving automobile." (citations omitted)). Reasonable suspicion is a quantum of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also*

*Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). Courts evaluate the presence of reasonable suspicion based upon the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. A seizure, however brief, that lacks reasonable suspicion contravenes the Fourth Amendment. *United States v. Jones*, 562 F.3d 768, 773 (6th Cir. 2009). "The process [of determining whether an officer had reasonable suspicion] does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 418 (1981). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted).

Here, two officers heard shots fired in the vicinity of a church within a thirty-second walk of the Pint House bar on Merchant Drive.[2] Officer Harvey articulated clear and specific facts to support her reasonable suspicion that Defendant was involved in the shooting. Officer Harvey testified that Officers McCurry and Seder had information from two witnesses that a back Dodge Ram left the vicinity of the shots fired. At least one of the women said the vehicle was traveling eastbound on Merchant Drive. Officer Harvey used images from three Flock cameras on Merchant Drive close to the Pint House to identify a black Chevy Silverado with dealer tags leaving the area where shots fired were reported and within one minute of the radio report of the shooting. While the Silverado was not the same make and model as the truck identified by witnesses, it was a similar make and model, the same color, was in the area of the incident at the same time the officer

---

[2] Discharging firearms within the city limits of Knoxville is a violation of the municipal code. Offenses Ordinance of the City of Knoxville § 19-109.

reported shots fired, and according to Officer Harvey, was the only vehicle captured in the Flock images that came close to the description provided by the witnesses. When Officers Harvey and Seder passed the Silverado, it was not headed in the reported direction given by the witness, but it was only one-half mile away from the location of the incident.

While following Defendant's vehicle, the officers witnessed Defendant commit a traffic violation and turned on their emergency lights. Instead of stopping in the commercial parking lot, the Silverado drove away at an accelerated speed and fled the officers for more than one minute. Defendant's evasion, however brief, contributed to the officer's reasonable suspicion that Defendant had committed a crime. *United States v. Ledbetter*, 929 F. 3d 338, 347 (6th Cir. 2019) ("[T]he failure to immediately pull over and any attempts to evade officers . . . can support a reasonable suspicion." (citations omitted)); *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of it."); *Watkins v. City of Southfield*, 221 F.3d 883, 889 (6th Cir. 2000) (finding that "the fact that [the defendant] refused to stop when he was directed to do so contributed to the officers' suspicion that criminal activity may have been afoot" and deeming "the ignoring of orders to pull over the vehicle to be equivalent for these purposes to attempting to flee from police upon a signal to stop"); *see also United States v. Brigoni-Ponce*, 422 U.S. 873, 885 (1975) (holding that a "driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion" (citations omitted)).

Given the totality of the circumstances, namely that Defendant's vehicle was identified as leaving the vicinity of the shooting through the Flock cameras, that it was the same color and a similar make and model as that identified by the two witnesses, and that Defendant attempted to

evade law enforcement, the undersigned finds that the officers had reasonable suspicion to conclude that Defendant's vehicle was potentially involved in the shooting.

Defendant argues the officers stopped him on no more than a hunch because he was driving a different truck than that described by the witnesses and he was coming from the opposite direction [Doc. 76 p. 7; Doc. 98 pp. 9–11]. When evaluating the totality of the circumstances, the court cannot ignore significant inconsistencies between a reported description and the facts. *United States v. Jackson*, 188 F. App'x 403, 409 (6th Cir. 2006) (finding officers lacked reasonable suspicion when the vehicle stopped "was a different make and model from that being sought, [was] traveling in the wrong direction, and . . . was driven by an individual who did not match the physical description of the suspect"). Yet differences in model and make are less significant when the vehicles resemble each other, as Officer Harvey testified a Dodge Ram and a Chevrolet Silverado did here. *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (finding reasonable suspicion to stop a "dark blue Mercury Cougar" heading eastbound, when the dispatcher reported a "dark-colored Thunderbird" with front end damage and a missing grill that was seen heading southbound because the deputy had described the two cars as "sister models . . . identical except for a few cosmetic differences"); *see also United States v. Marxen*, 410 F.3d 326, 331 (6th Cir. 2005) (finding reasonable suspicion when "the police were reasonably certain of the make, model and general color of the automobile used in the . . . robbery" and had a partial license plate number, even though the description of the driver did not match). *C.f. Jackson*, 188 F. App'x at 409 ("A green BMW does not at all resemble a green Dodge Neon . . . ."). Moreover, the Silverado was traveling in the direction described by one of the witnesses, when it was photographed by the Flock camera within one minute of the shots-fired dispatch.

40

Defendant also argues that Officer Harvey's "testimony about her utilization of the Flock system was not credible when viewed in the light of the entirety of the evidence at the hearing" [Doc. 98 p. 11]. He contends "she did not recall specifically what camera she viewed, or which camera purportedly captured the image of a black Silverado" and "did not record, preserve, or alert dispatch of the license plate numbers or information" [*Id.* at 11]. He further argues that "she did not include any information about reviewing Flock footage in her affidavit . . . and she additionally admitted that she copied [Officer] Seder's initial warrants which included information that was materially false and inaccurate" [*Id.*]. Defendant also questions Officer Harvey's ability to "search[] a Flock database, receive[] as many as 50 images, sort[] through those images, identif[y] a black truck, pull[] a separate search for a daytime photo, and . . close[] her computer" all allegedly occurring between 2:13 and 2:15–16 a.m. [*Id.*]. He argues that "[t]he more plausible scenario is that officers were looking for a black Dodge Ram, saw a black Chevy Silverado, and initiated a stop based on a hunch" [*Id.*].

A court may credit a witness's testimony "so long as [it] is facially plausible, internally consistent, and uncontradicted by extrinsic evidence." *United States v. Bowman*, No. 1:21-cr-56-TRM-SKL, 2022 WL 1518251, at *7 (E.D. Tenn. Feb. 11, 2022) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)), *report & recommendation adopted by* 2022 WL 1117101 (E.D. Tenn. Apr. 14, 2022). Officer Harvey's testimony of how she identified Defendant's vehicle as a vehicle connected to the crime is plausible, given her experience and knowledge as an officer and her training in the Flock system.

Officer Harvey testified that after the dispatch of shots-fired, her and Officer Seder traveled to the location of the crime. While looking for the vehicle that matched the description given by witnesses, Officer Harvey used the Flock system to see if any pictures of any vehicles had been

captured in the area at the time of the shooting. She testified that she had received training in using the Flock database. She stated that there was only one vehicle that matched the description of a black Dodge Ram given by witnesses captured by the Flock cameras during the time frame of her search: a black Chevy Silverado, with visible white dealer tags that was seen leaving the vicinity of the crime one-minute before Officer McCurry radioed that he had heard shots fired.

She testified that she used the visible license plate number on the truck captured by the Flock system to again search the Flock database, this time using the specific license plate number, to get a better picture of the vehicle, and was able to find one of the Silverado in the daytime. This testimony is corroborated by her body camera footage which shows a daytime picture of Defendant's vehicle on her computer screen while she and Officer Seder are searching for the truck. Officer Harvey testified that she looked through as few as ten images. Both she and Officer Ragon testified that traffic was light on Merchant Drive in the early morning. The undersigned finds that Officer Harvey's testimony about retrieving the photos from the Flock system is internally consistent, plausible on its face, and corroborated by the dash camera and body camera videos. Accordingly, her testimony is credible.

The collective knowledge doctrine "recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'" *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012) (citation omitted). Courts "impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Id.* at 766 (citations omitted).

While Officer Harvey admitted that she had copied information from Officer Seder's warrant for her warrant, she also testified that was standard for officers to do when multiple officers work on a single investigation. She stated that it would be difficult for one officer to do everything in an investigation and that they often rely on the information gathered by other officers. She further explained that her use of Officer Seder's information was normal given that she was his training officer and was with him for the investigation. Finally, the alleged false information in Officer Harvey's narrative—that the witnesses wished to remain anonymous—was not material to the probable cause in the arrest warrant, nor to Officer Harvey's reasonable suspicion for the stop.

In sum, based upon the totality of the circumstances known to Officers Seder and Harvey at the time of the stop, they had reasonable suspicion to stop Defendant to investigate his involvement the shots-fired report.

## B. Search of the Vehicle

Defendant contends that the evidence seized from his vehicle is the fruit of an illegal seizure, and the warrantless search of his vehicle violated the Fourth Amendment [Doc. 76 p. 10]. Specifically, he argues that the officers could not search his truck incident to his arrest because he was handcuffed and detained away from his truck and they had no reason to believe that evidence of evading arrest would be located inside [*Id*.]. Thus, Defendant denies the necessity of a "protective sweep" of his truck [Doc. 98 p. 16]. He also denies application of the plain-view doctrine, the automobile exception, and the inevitable discovery doctrine [Doc. 98 pp. 14–17].

For the reasons discussed below, the undersigned finds that the officers properly seized the gun and bullets from Defendant's vehicle pursuant to a protective search and that they would have inevitably discovered the items seized during the protective search during an inventory search of the vehicle.

43

### 1. Protective Search

The Government asserts that the officers permissibly looked inside Defendant's truck and opened the passenger side door to check for other occupants and weapons and to ensure the safety of officers on the scene [Doc. 82 p. 8]. "A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop . . . and conducting pat-down searches 'upon reasonable suspicion that they may be armed and dangerous.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (driver), & *Maryland v. Wilson*, 519 U.S. 408, 413–14 (1997) (passenger) & other citations omitted). Whether such a pat down is warranted requires the officer to have a reasonable suspicion of criminal activity and a reasonable belief that the suspect is armed and dangerous. *See Terry*, 392 U.S. at 30; *United States v. Walker*, 181 F.3d 774, 778 (6th Cir. 1999).

Defendant does not challenge that he was required to exit the truck, was frisked, and handcuffed. Instead, he maintains that the officers had no basis to enter his vehicle and conduct a sweep because he was detained away from his truck [Doc. 76 pp. 9–10 (citing *Arizona v. Gant*, 556 U.S. 332, 351–52 (2009))]. The Government contends a protective sweep was warranted for officer safety because the truck could contain hidden passengers [Doc. 82 p. 9] and because Defendant could have been permitted access to the truck later in the stop or could have broken away from law enforcement and gained a weapon [*id*. at 11–13; Doc. 99 pp. 11–12].

Investigatory stops of individuals in vehicles "are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). "Law enforcement officials are of course entitled to take reasonable protective measures for their safety . . . ." *United States v. Williams*, No. 24-5507, 2025 WL 674223, at *2 (6th Cir. Mar. 3, 2025). In this regard, an officer may

properly require not only the driver but also any passengers to exit a vehicle during a stop for officer safety. *Wilson*, 519 U.S. at 414–15. Additionally, just as "officers can perform protective searches for weapons if they reasonably suspect that the stopped individual is 'armed and dangerous[,]'" an officer can perform a "more expansive protective search[]" of a vehicle, *McMullen*, 103 F.4th at 1229, if the officer reasonably believes "the suspect is dangerous and the suspect may gain immediate control of weapons," *Long*, 463 U.S. at 1049 (1983). Such protective searches are permitted even if the individual has vacated the vehicle because a suspect detained by police could "break away from police control and retrieve a weapon from his automobile" or be permitted to reenter his vehicle if not arrested. *Id*. at 1051. Thus, "[o]fficers with the requisite reasonable suspicion may search the passenger compartment of a suspect's vehicle—including closed compartments—for accessible weapons." *McMullen*, 103 F.4th at 1229 (observing that protective searches are permissible even if the suspect is no longer inside the vehicle).

Here, Officer Seder properly ordered any passengers to get out of the truck. As Officer Ragon testified, no passengers exited, and the officers could not see inside the truck because the parking lot was dark, the windows of the truck were tinted, and the height of the truck made it difficult for the officers to look inside. The Government asserts that "[g]iven the totality of the circumstances, [including that the officers reasonably suspected the truck was connected to a shots-fired report and Defendant fled from the officers,] a reasonable officer in Officer Seder's position would have believed that the officers on the scene were at risk of harm justifying him opening the front passenger door of [D]efendant's truck" [Doc. 82 pp. 9–10]. The undersigned agrees. Moreover, the officers on the scene reasonably believed that the truck could contain a weapon because they had reasonable suspicion that Defendant was involved in the shots-fired incident, and he did not have a weapon on his person when frisked.

45

Defendant argues that Officer Seder's opening the passenger-side door to check for passengers was unreasonable because the driver's side door was open and the truck's interior lights were illuminated [Doc. 98 p. 15]. In executing a protective search, however, the officers may "search the passenger compartment of his vehicle—limited to areas that could store a weapon— for any immediately accessible firearms." *McMullen*, 103 F.4th at 1232 (citation omitted). The fact that the passenger door was closed did not eliminate the potential danger to officers because Defendant could have attempted to reenter or been permitted to reenter his truck. "[A] weapon isn't necessarily inaccessible just because it is temporarily behind a closed door." *Id.* (citation omitted).

Defendant also argues that the officers' search of his truck was unwarranted because he was handcuffed and detained at the time evidencing "no risk . . . that [he] could regain access to the vehicle or that he would be released at that point" [Doc. 98 p. 16]. But "protective vehicle searches can be appropriate even when the suspect is outside of his vehicle and under police control." *McMullen*, 103 F.4th at 1232 (citing *Long*, 463 U.S. at 1051–52); *see also United States v. Boyett*, 295 F. App'x 781, 785–86 (6th Cir. 2008) (affirming protective search of vehicle including console for a firearm while defendant and his passenger, suspected of armed robbery, were handcuffed and detained in patrol cars); *United States v. Shank*, 543 F.3d 309, 314–18 (6th Cir. 2008) (affirming protective search of glove compartment and area within driver's reach while defendant seated in patrol car during traffic stop because defendant would be permitted to reenter his vehicle at the conclusion of the stop).

Our appellate court has affirmed a protective search when the vehicle's occupants were similarly detained. In *Boyett*, the officers stopped a vehicle on suspicion of the occupants' involvement in an armed robbery and conducted a "high-risk stop," in which the officer ordered

the occupants out of the vehicle at gunpoint, handcuffed them, detained them in separate patrol cars, and searched the passenger compartment of the vehicle for weapons. 295 F. App'x at 783. There, as here, the search of the vehicle was "justified [because a]n officer making a *Terry* stop may take 'preventive measures to ensure that there were no other weapons within [the subject's] immediate grasp before permitting him to reenter his automobile.'" *Id.* (second alteration in original) (quoting *Long*, 463 U.S. at 1051).

"In evaluating the validity of an officer's investigative or protective conduct under *Terry*, the "[t]ouchstone of our analysis . . . is always 'the reasonableness in all circumstances of the particular governmental intrusion of a citizen's personal security.'" *Long*, 463 U.S. at 1051 (quoting *Mimms*, 434 U.S. at 108–109 (internal citations omitted)). Here, Officers Seder and Ragon reasonably conducted a protective search of the passenger compartment of Defendant's truck to preserve the safety of those on the scene should Defendant be permitted to return to his vehicle during or at the conclusion of the stop. The officers properly seized the firearm on the passenger-side floorboard and the two unspent bullets on the driver's seat pursuant to this search.

### 2.    Inevitable Discovery Based on an Inventory Search

The Government also contends that the officers would have inevitably discovered the gun and spent and unspent bullets in Defendant's vehicle when they inventoried its contents prior to impounding it [Doc. 82 pp. 3–15; Doc. 99 pp. 12–13]. The inevitable-discovery doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir 1995) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (citations omitted).

47

"An inventory search is the search of property lawfully seized and detained, in order to ensure that its harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren*, 517 U.S. at 811 n.1.

"The government can establish inevitable discovery 'by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.'" *United States v. James*, No. 17-5994, 2018 WL 7482185, at *1 (6th Cir. Sept. 4, 2018) (quoting *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999)). The government must make this showing by a preponderance of the evidence. The Court examine the circumstances "as they existed at the instant before the unlawful search, [and assesses] what would have happened had the unlawful search never occurred.'" *United States v. Hodge*, 714 F.3d 380, 387 (6th Cir. 2013) (quoting *Kennedy*, 61 F.3d at 498). Thus, if an inventory search would have occurred following the conclusion of the stop and arrest of Defendant Reece, the inevitable discovery doctrine applies to the evidence seized from the search of Defendant's truck.

"An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citations omitted). The purpose of an inventory search is to affirm the vehicle contains no harmful items, to secure items of value, and to protect the impounding law enforcement agency against false claims that items have been lost or damaged. *United States v. Snoddy*, 976 F.3d 630, 633–34 (6th Cir. 2020) (citing *Whren*, 517 U.S. at 811 n.1). An inventory search is valid if law enforcement has lawful custody of a vehicle, *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007), and acts according to a defined policy, which need not be written, *Alexander*, 954 F.3d at 915. "Officers exercising their discretion

to impound a vehicle must do so 'according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Snoddy*, 976 F.3d at 634 (quoting *United States v. Jackson*, 682 F.3d 448, 454 (6th Cir. 2012)). Inventory searches are valid to the extent that officers follow a "'standardized criteria . . . or established routine' to assure that inventory searches are not a 'ruse for general rummaging in order to discover incriminating evidence.'" *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013) (omission in original) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). In other words, an inventory search must be executed pursuant to routine law enforcement procedures and may not be performed for the purpose of investigation. *Snoddy*, 976 F.3d at 634; *Alexander*, 954 F.3d at 916.

Defendant Reece was stopped for traffic violations and on reasonable suspicion of his involvement in a shots-fired incident. He was arrested for evading arrest in violation of Tennessee Code Annotated § 39-16-603. Officer Harvey testified that pursuant to KPD policy, an arrested person who is the registered owner can decide whether their vehicle should remain at the scene or if they will have someone pick it up [Doc. 94 pp. 41–42]. She stated that the Silverado was towed because Defendant was not the registered owner, he declined to speak with the officers, and the truck was involved in a crime [*Id.* at 40–42]. Officer Ragon testified that after Defendant's arrest, the officers had the vehicle towed and logged the gun and other evidence [*Id.* at 99–100].

The Government introduced the KPD's policies for towing vehicles [Exh. 5]. The policy states that vehicles will be towed when the driver is arrested and "unable or unwilling" to make other arrangements for the vehicle [*Id.* at 6]. If the driver is the registered owner of the vehicle, then the driver may "make [his or her] own arrangements for the custody and safekeeping of [the] vehicle" [*Id.*]. Prior to towing the vehicle of an arrested driver, the officer must "conduct a thorough inventory of the entire vehicle" [*Id.* at 7]. Any weapons, contraband, or evidence found

during the inventory "shall be confiscated" [*Id*.]. The policy also provides that vehicles that are evidence of a crime or contain evidence of a crime shall also be towed [*Id*. at 10]. Such vehicles are not inventoried at the scene but, instead, are impounded, sealed, and later processed by a forensics unit [*Id*.]. The policy states that officers shall obtain a search warrant prior to processing "[i]f an investigator or investigating [officer] determine[s] there is [an] expectation of privacy to [sic.] the vehicle" [*Id*.].

Here, Defendant was arrested and was not the registered owner of the Silverado.[3] Thus, KPD's written towing policy required that the vehicle be towed and inventoried prior to towing. Accordingly, the officers towed Defendant's vehicle pursuant to standardized criteria in the KPD's towing policy. Therefore, the officer would have inevitably discovered the firearm, ammunition, and shell casing during an inventory search before towing, and the evidence was lawfully seized.[4]

## IV.    CONCLUSION

Law enforcement properly stopped Defendant for traffic violations and had reasonable suspicion he was involved in a shots-fired incident to conduct an investigatory stop of his vehicle. The officers also lawfully searched the vehicle after Defendant had been placed into custody pursuant during a protective search and would have inevitably discovered the seized items during an inventory search. For all the reasons explained herein, the undersigned respectfully

---

[3]    Defendant argues that the Government failed to prove that he was not the registered owner [Doc. 98 p. 16]. To the contrary, the only evidence before the Court on the matter is Officer Harvey's testimony that Defendant was not the registered owner of the truck. She also testified that Defendant was unwilling to speak to officers about the truck. According to the KPD towing policy, if an arrested driver is "unable or unwilling to make arrangements for the vehicle," the KPD will have it towed to the impound lot [Exh. 5 p. 6].

[4]    Because the firearm, bullets, and casing were properly seized in the protective search and would have been inevitably discovered in the inventory search, the undersigned need not assess whether the officers had probable cause to seize these items based upon the plain view or automobile exceptions to the warrant requirement.

50

**RECOMMENDS**[5] that the District Judge **DENY** Defendant Brandon Reece's Motion to Suppress

[**Doc. 76**].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[5]    Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs*, 829 F.2d 1370, 1373 (6th Cir. 1987).